| FRAMING HEALTH MATTERS |

# Mental Illness, Mass Shootings, and the Politics of American Firearms

| Jonathan M. Metzl, MD, PhD, and Kenneth T. MacLeish, PhD

Four assumptions frequently arise in the aftermath of mass shootings in the United States: (1) that mental illness causes gun violence, (2) that psychiatric diagnosis can predict gun crime, (3) that shootings represent the deranged acts of mentally ill loners, and (4) that gun control "won't prevent" another Newtown (Connecticut school mass shooting). Each of these statements is certainly true in particular instances. Yet, as we show, notions of mental illness that emerge in relation to mass shootings frequently reflect larger cultural stereotypes and anxieties about matters such as race/ethnicity, social class, and politics. These issues become obscured when mass shootings come to stand in for all gun crime, and when "mentally ill" ceases to be a medical designation and becomes a sign of violent threat. (*Am J Public Health.* 2015;105:240–249. doi:10.2105/AJPH.2014.302242)

In the United States, popular and political discourse frequently focuses on the causal impact of mental illness in the aftermath of mass shootings. For instance, the US media diagnosed shooter Adam Lanza with schizophrenia in the days following the tragic school shooting at Sandy Hook elementary school in Newtown, Connecticut, in December 2012. "Was Adam Lanza an undiagnosed schizophrenic?" asked *Psychology Today.*[1] "Lanza's acts of slaughter . . . strongly suggest undiagnosed schizophrenia" added the *New York Times.*[2] Conservative commentator Anne Coulter provocatively proclaimed that "Guns don't kill people—the mentally ill do."[3]

Similar themes permeated political responses to Newtown as well. In a contentious press conference, National Rifle Association President Wayne LaPierre blamed "delusional killers" for violence in the United States, while calling for a "national registry" of persons with mental illness.[4] Meanwhile, in the months after the shooting, a number of states passed bills that required mental health professionals to report "dangerous patients" to local officials, who would then be authorized to confiscate any firearms that these persons might own. "People who have mental health issues should not have guns," New York Governor Andrew Cuomo told reporters after one such bill passed the New York Senate. "They could hurt themselves, they could hurt other people."[5]

Such associations make sense on many levels. Crimes such as Newtown—where Lanza killed 20 children and 6 adults with a military-grade semiautomatic weapon—appear to fall outside the bounds of sanity: who but an insane person would do such horrifying things? And, of course, scripts linking guns and mental illness arise in the aftermath of many US mass shootings in no small part because of the psychiatric histories of the assailants. Reports suggest that up to 60% of perpetrators of mass shootings in the United States since 1970 displayed symptoms including acute paranoia, delusions, and depression before committing their crimes.[6,7] Aurora, Colorado, movie theater shooter James Holmes "was seeing a psychiatrist specializing in schizophrenia" before he opened fire in a crowded theater.[8] Classmates felt unsafe around Jared Loughner because he would "laugh randomly and loudly at nonevents" in the weeks before he shot US Congresswoman Gabrielle Giffords and 6 other people at a rally in front of a supermarket in Tucson, Arizona.[9] Lanza "struggled with basic emotions" as a child and wrote a story "in which an old woman with a gun in her cane kills wantonly."[10] Isla Vista, California, shooter Elliot Rodger suffered from Asperger's disorder and took psychotropic medications.[11]

It is undeniable that persons who have shown violent tendencies should not have access to weapons that could be used to harm themselves or others. However, notions that mental illness caused any particular shooting, or that advance psychiatric attention might prevent these crimes, are more complicated than they often seem.

We accessed key literatures from fields including psychiatry, psychology, public health, and sociology that address connections between mental illness and gun violence. We obtained articles through comprehensive searches in online English-language psychiatric, public health, social science, and popular media databases including PsychINFO, PsychiatryOnline, PubMed, SCOPUS, and LexisNexis. Search terms included keyword combinations of terms such as guns or firearms with terms such as mental illness or schizophrenia, with a time frame of 1980 through 2014. We also conducted manual online searches for specific authors, organizations, and news outlets that produced relevant research on these topics. (Though not peer-reviewed, investigative journalism and online archives proved important secondary sources that often functioned outside regulations limiting firearms research.[12,13]) Finally, we accessed our own primary source historical research on race/ethnicity, violence, and mental illness,[14] and US gun culture.[15–17]

From this review we critically addressed 4 central assumptions that frequently arise in the aftermath of mass shootings:

(1) Mental illness causes gun violence,
(2) Psychiatric diagnosis can predict gun crime before it happens,
(3) US mass shootings teach us to fear mentally ill loners, and
(4) Because of the complex psychiatric histories of mass shooters, gun control "won't prevent" another Tucson, Aurora, or Newtown.

Each of these statements is certainly true in particular instances. Evidence strongly suggests that mass shooters are often mentally ill and socially marginalized. Enhanced psychiatric attention may well prevent particular crimes. And, to be sure, mass shootings often shed light on the need for more investment in mental health support networks or improved state laws and procedures regarding gun access.[18]

At the same time, the literatures we surveyed suggest that these seemingly self-evident

**Ex 1, p. 1**

assumptions about mass shootings are replete with problematic assumptions, particularly when read against current and historical literatures that address guns, violence, and mental illness more broadly. On the aggregate level, the notion that mental illness causes gun violence stereotypes a vast and diverse population of persons diagnosed with psychiatric conditions and oversimplifies links between violence and mental illness. Notions of mental illness that emerge in relation to mass shootings frequently reflect larger cultural issues that become obscured when mass shootings come to stand in for all gun crime and when "mentally ill" ceases to be a medical designation and becomes a sign of violent threat.

Anxieties about insanity and gun violence are also imbued with oft-unspoken anxieties about race, politics, and the unequal distribution of violence in US society. In the current political landscape, these tensions play out most clearly in the discourse surrounding controversial "stand-your-ground" laws. "It's not about stand your ground," read a headline on cnn.com, "it's about race."[19] Our analysis suggests that similar, if less overt historical tensions suffuse discourses linking guns and mental illness in ways that subtly connect "insane" gun crimes with oft-unspoken assumptions about "White" individualism or "Black" communal aggression.

Again, it is understandable that US policymakers, journalists, and the general public look to psychiatry, psychology, neuroscience, and related disciplines as sources of certainty in the face of the often-incomprehensible terror and loss that mass shootings inevitably produce. This is especially the case in the current political moment, when relationships between shootings and mental illness often appear to be the only points upon which otherwise divergent voices in the contentious national gun debate agree.

Our brief review ultimately suggests, however, that this framework—and its implicit promise of mental health solutions to ostensibly mental health problems—creates an untenable situation in which mental health practitioners increasingly become the persons most empowered to make decisions about gun ownership and most liable for failures to predict gun violence. Meanwhile, public, legal, and medical discourses move ever-farther away[20] from talking broadly and productively about the social, structural, and, indeed, psychological implications of gun violence in the United States.

## THE ASSUMPTION THAT MENTAL ILLNESS CAUSES GUN VIOLENCE

The focus on mental illness in the wake of recent mass shootings reflects a decades-long history of more general debates in psychiatry and law about guns, gun violence, and "mental competence." Psychiatric articles in the 1960s deliberated ways to assess whether mental patients were "of sound mind enough" to possess firearms.[21] Following the 1999 mass shooting at Columbine High School, Breggin decried the toxic combination of mental illness, guns, and psychotropic medications that contributed to the actions of shooter Eric Harris.[22] After the 2012 shooting at Newtown, Torrey amplified his earlier warnings about dangerous "subgroups" of persons with mental illness who, he contended, were perpetrators of gun crimes. Speaking to a national television audience, Torrey, a psychiatrist, claimed that "about half of . . . mass killings are being done by people with severe mental illness, mostly schizophrenia, and if they were being treated they would have been preventable."[23] Similar themes appear in legal dialogues as well. Even the US Supreme Court, which in 2008 strongly affirmed a broad right to bear arms, endorsed prohibitions on gun ownership "by felons and the mentally ill" because of their special potential for violence.[24]

Yet surprisingly little population-level evidence supports the notion that individuals diagnosed with mental illness are more likely than anyone else to commit gun crimes. According to Appelbaum,[25] less than 3% to 5% of US crimes involve people with mental illness, and the percentages of crimes that involve guns are lower than the national average for persons not diagnosed with mental illness. Databases that track gun homicides, such as the National Center for Health Statistics, similarly show that fewer than 5% of the 120 000 gun-related killings in the United States between 2001 and 2010 were perpetrated by people diagnosed with mental illness.[26]

Meanwhile, a growing body of research suggests that mass shootings represent anecdotal distortions of, rather than representations of, the actions of "mentally ill" people as an aggregate group. By most estimates, there were fewer than 200 mass shootings reported in the United States—often defined as crimes in which four or more people are shot in an event, or related

series of events—between 1982 and 2012.[27,28] Recent reports suggest that 160 of these events occurred after the year 2000[29] and that mass shootings rose particularly in 2013 and 2014.[28] As anthropologists and sociologists of medicine have noted, the time since the early 1980s also marked a consistent broadening of diagnostic categories and an expanding number of persons classifiable as "mentally ill."[30] Scholars who study violence prevention thus contend that mass shootings occur far too infrequently to allow for the statistical modeling and predictability—factors that lie at the heart of effective public health interventions. Swanson argues that mass shootings denote "rare acts of violence"[31] that have little predictive or preventive validity in relation to the bigger picture of the 32 000 fatalities and 74 000 injuries caused on average by gun violence and gun suicide each year in the United States.[32]

Links between mental illness and other types of violence are similarly contentious among researchers who study such trends. Several studies[33–35] suggest that subgroups of persons with severe or untreated mental illness might be at increased risk for violence in periods surrounding psychotic episodes or psychiatric hospitalizations. Writing in the *American Journal of Psychiatry*, Keers et al. found that the emergence of "persecutory delusions" partially explained associations between untreated schizophrenia and violence.[36] At the same time, a number of seminal studies asserting links between violence and mental illness—including a 1990 study by Swanson et al.[37] cited as fact by the *New York Times* in 2013[38]—have been critiqued for overstating connections between serious mental illness and violent acts.[39]

Media reports often assume a binary distinction between mild and severe mental illness, and connect the latter form to unpredictability and lack of self-control. However, this distinction, too, is called into question by mental health research. To be sure, a number of the most common psychiatric diagnoses, including depressive, anxiety, and attention-deficit disorders, have no correlation with violence whatsoever.[18] Community studies find that serious mental illness without substance abuse is also "statistically unrelated" to community violence.[40] At the aggregate level, the vast majority of people diagnosed with psychiatric disorders do not commit violent acts—only about 4% of violence in the

**Ex 1, p. 2**

United States can be attributed to people diagnosed with mental illness.[41,42]

A number of studies also suggest that stereotypes of "violent madmen" invert on-the-ground realities. Nestor theorizes that serious mental illnesses such as schizophrenia actually reduce the risk of violence over time, as the illnesses are in many cases marked by social isolation and withdrawal.[43] Brekke et al. illustrate that the risk is exponentially greater that individuals diagnosed with serious mental illness will be assaulted by others, rather than the other way around. Their extensive surveys of police incident reports demonstrate that, far from posing threats to others, people diagnosed with schizophrenia have victimization rates 65% to 130% higher than those of the general public.[44] Similarly, a meta-analysis by Choe et al. of published studies comparing perpetuation of violence with violent victimization by and against persons with mental illness concludes that "victimization is a greater public health concern than perpetration."[33(p153)] Media reports sound similar themes: a 2013 investigation by the *Portland Press Herald* found that "at least half" of persons shot and killed by police in Maine suffered from diagnosable mental illness.[45–48]

This is not to suggest that researchers know nothing about predictive factors for gun violence. However, credible studies suggest that a number of risk factors more strongly correlate with gun violence than mental illness alone. For instance, alcohol and drug use increase the risk of violent crime by as much as 7-fold, even among persons with no history of mental illness—a concerning statistic in the face of recent legislation that allows persons in certain US states to bring loaded handguns into bars and nightclubs.[49,50] According to Van Dorn et al., a history of childhood abuse, binge drinking, and male gender are all predictive risk factors for serious violence.[51]

A number of studies suggest that laws and policies that enable firearm access during emotionally charged moments also seem to correlate with gun violence more strongly than does mental illness alone. Belying Lott's argument that "more guns" lead to "less crime,"[52] Miller et al. found that homicide was more common in areas where household firearms ownership was higher.[53] Siegel et al. found that states with high rates of gun ownership had disproportionately high numbers of deaths from firearm-related homicides.[54] Webster's analysis uncovered that the repeal of Missouri's background check law led to an additional 49 to 68 murders per year,[55] and the rate of interpersonal conflicts resolved by fatal shootings jumped by 200% after Florida passed "stand your ground" in 2005.[56] Availability of guns is also considered a more predictive factor than is psychiatric diagnosis in many of the 19 000 US completed gun suicides each year.[11,57,58] (By comparison, gun-related homicides and suicides fell precipitously, and mass-shootings dropped to zero, when the Australian government passed a series of gun-access restrictions in 1996.[59])

Contrary to the image of the marauding lone gunman, social relationships also predict gun violence. Regression analyses by Papachristos et al. demonstrate that up to 85% of shootings occur within social networks.[60] In other words, people are far more likely to be shot by relatives, friends, enemies, or acquaintances than they are by lone violent psychopaths. Meanwhile, a report by the police department of New York City found that, in 2013, a person was "more likely to die in a plane crash, drown in a bathtub or perish in an earthquake" than be murdered by a crazed stranger in that city.[61]

Again, certain persons with mental illness undoubtedly commit violent acts. Reports argue that mental illness might even be underdiagnosed in people who commit random school shootings.[62] Yet growing evidence suggests that mass shootings represent statistical aberrations that reveal more about particularly horrible instances than they do about population-level events. To use Swanson's phrasing, basing gun crime–prevention efforts on the mental health histories of mass shooters risks building "common evidence" from "uncommon things."[31] Such an approach thereby loses the opportunity to build common evidence from common things—such as the types of evidence that clinicians of many medical specialties might catalog, in alliance with communities, about substance abuse, domestic violence, availability of firearms, suicidality, social networks, economic stress, and other factors.

Gun crime narratives that attribute causality to mental illness also invert the material realities of serious mental illness in the United States. Commentators such as Coulter blame "the mentally ill" for violence, and even psychiatric journals are more likely to publish articles about mentally ill aggression than about victimhood.[5] But, in the real world, these persons are far more likely to be assaulted by others or shot by the police than to commit violent crime themselves. In this sense, persons with mental illness might well have more to fear from "us" than we do from "them." And blaming persons with mental disorders for gun crime overlooks the threats posed to society by a much larger population—the sane.

## THE ASSUMPTION THAT PSYCHIATRIC DIAGNOSIS CAN PREDICT GUN CRIME

Legislation in a number of states now mandates that psychiatrists assess their patients for the potential to commit violent gun crime. New York State law requires mental health professionals to report anyone who "is likely to engage in conduct that would result in serious harm to self or others" to the state's Division of Criminal Justice Services, which then alerts the local authorities to revoke the person's firearms license and confiscate his or her weapons.[5] California adopted a 5-year firearms ban for anyone who communicates a violent threat against a "reasonably identifiable victim" to a licensed psychotherapist.[63] Similarly, a bill "passed as a response to mass shootings" requires Tennessee-based mental health professionals to report "threatening patients" to local law enforcement.[64]

Supporters of these types of laws argue that they provide important tools for law enforcement officials to identify potentially violent persons. Indeed, an investigative report by the *New York Times* found that in Connecticut in the aftermath of similar legislation, "there were more than 180 instances of gun confiscations from people who appeared to pose a risk of 'imminent personal injury to self or others.' Close to 40% of these cases involved serious mental illness."[38]

History suggests, however, that psychiatrists are inefficient gatekeepers in this regard. Data supporting the predictive value of psychiatric diagnosis in matters of gun violence is thin at best. Psychiatric diagnosis is largely an observational tool, not an extrapolative one. Largely for this reason, research dating back to the 1970s suggests that psychiatrists using clinical

**Ex 1, p. 3**



## "CLEAN, COOPERATIVE, AND COMMUNICATIVE"

Under the influence of Serpasil, patients who had been destructive, resistant, hostile, withdrawn, untidy, or troubled with hallucinations became, in a short period of time, "clean, cooperative, and communicative persons."[1]

Serpasil has been shown to be effective even in violently disturbed psychotics *if sufficiently high dosage is used.* After 6 to 8 weeks of Serpasil therapy in 127 chronic schizophrenics "the result was frequently astounding, even to psychiatrists of long clinical experience."[1]

In similar studies, the worst behavior problems in the hospital showed improvement, chiefly ". . . a reduction of motor activity, of tension, of hostility, and aggressiveness."[2] Many reports have indicated that Serpasil

may be substituted for electro- or insulin shock and that it sharply reduces destruction and assaults in the violent back wards.

*Adequate trial is essential*—a minimum of 3 months, beginning with "parenteral doses of at least 5 mg. of reserpine and continued daily doses of 2 to 8 mg. orally."[1] "The occurrence of the turbulent phase (with exaggeration of symptoms) is *not* an indication for discontinuing treatment."[3]

1. Hollister, L. E., Krieger, G. E., Kringel, A., and Roberts, R. H.: Ann. New York Acad. Sc. *61*:92 (April 15) 1955. 2. Hoffman, J. L., and Konchegul, L.: Ann. New York Acad. Sc. *61*:144 (April 15) 1955. 3. Kline, N. S., and Stanley, A. M.: Ann. New York Acad. Sc. *61*:85 (April 15) 1955.

*Parenteral Solution,* 2-ml. ampuls, 2.5 mg. Serpasil per ml. *Tablets,* 4.0 mg. (scored), 2.0 mg. (scored), 1.0 mg. (scored), 0.25 mg. (scored) and 0.1 mg. *Elixir,* 1.0 mg. and 0.2 mg. Serpasil per 4-ml. teaspoon.

### Serpasil®
(reserpine CIBA)

**in high dosage for**

**psychiatric patients**

C I B A
SUMMIT, N.J.          2/2262M

**FIGURE 1—Serpasil advertisement.[75]**

judgment are not much better than laypersons at predicting which individual patients will commit violent crimes and which will not. For instance, a 1978 survey by Steadman and Cocozza of "Psychiatry, Dangerousness, and the Repetitively Violent Offender" analyzed the "assumption widely held by the public, legislators and many criminal justice administrators, that psychiatric training and perspective make psychiatrists particularly well suited to predict violence."[65(p226)] They found that, "there is actually very little literature that provides empirical evidence dealing with psychiatric predictions of dangerousness,"[65(p226)] and that "despite statutory and procedural trends to the contrary, the data available suggest no reason for involving psychiatrists in the dispositional processes of violent offenders under the expectation of predictive expertise."[65(p229)] Thirty-three years later, Swanson put it even more succinctly: "psychiatrists using clinical judgment are not much better than chance at predicting which individual patients will do something violent and which will not."[31,45]

The lack of prognostic specificity is in large part a matter of simple math. Psychiatric diagnosis is in and of itself not predictive of violence, and even the overwhelming majority of psychiatric patients who fit the profile of recent US mass shooters—gun-owning, angry, paranoid White men—do not commit crimes.[25,50,66–68]

In this sense, population-based literature on guns and mental illness suggests that legislatures risk drawing the wrong lessons from mass shootings if their responses focus on asking psychiatrists to predict future events. Though rooted in valid concerns about public safety, legislation that expands mental-health criteria for revoking gun rights puts psychiatrists in potentially untenable positions, not because they are poor judges of character, but because the urgent political and social conditions psychiatrists are asked to diagnose are at times at odds with the capabilities of their diagnostic tools and prognostic technologies.

Complicating matters further, associations between violence and psychiatric diagnosis shift over time. For instance, schizophrenia—far and away the most common diagnosis linked by the US media to mass shooters[69]—was considered an illness of docility for much of the first half of the 20th century. From the 1920s to the 1950s, psychiatric literature often described schizophrenia as a "mild" form of insanity that affected people's abilities to "think and feel." Psychiatric authors frequently assumed that such patients were nonthreatening, and were therefore largely harmless to society.[70,71] Meanwhile, *New York Times* articles told of "schizophrenic poets" who produced brilliant rhymes, and popular magazines such as *Ladies' Home Journal* and *Better Homes and Gardens* wrote of unhappily married, middle-class housewives whose schizophrenic mood swings were suggestive of "Doctor Jekyll and Mrs. Hyde."[72–74] And advertisements for antipsychotic medications in leading psychiatric journals showed images of docile White women. A 1950s-era advertisement for Serpasil (reserpine; Figure 1) in the *American Journal of Psychiatry* touted the ways in which the breakthrough medication

**Ex 1, p. 4**

rendered women "clean, cooperative, and communicative."[75]

Only in the 1960s and 1970s did US society begin to link schizophrenia with violence and guns. Psychiatric journals suddenly described patients whose illness was marked by criminality and aggression. Federal Bureau of Investigation (FBI) most-wanted lists in leading newspapers described gun-toting "schizophrenic killers" on the loose,[76] and Hollywood films similarly showed angry schizophrenics who rioted and attacked.[77]

Historical analysis[14,78] suggests that this transformation resulted, not from increasingly violent actions perpetuated by "the mentally ill," but from diagnostic frame shifts that incorporated violent behavior into official psychiatric definitions of mental illness. Before the 1960s, official psychiatric discourse defined schizophrenia as a psychological "reaction" to a splitting of the basic functions of personality. Descriptors emphasized the generally calm nature of such persons in ways that encouraged associations with poets or middle-class housewives.[79] But in 1968, the second edition of the *Diagnostic and Statistical Manual of Mental Disorders (DSM)*[80] recast paranoid schizophrenia as a condition of "hostility," "aggression," and projected anger, and included text explaining that, "the patient's attitude is frequently hostile and aggressive, and his behavior tends to be consistent with his delusions."[80(p34-36)]

A somewhat similar story can be told about posttraumatic stress disorder (PTSD), another illness frequently associated with gun violence.[15] From the mid-19th century though World War II, military leaders and doctors assumed that combat-related stress afflicted neurotic or cowardly soldiers. In the wake of the Vietnam War, the *DSM-III* recast PTSD as a normal mind's response to exceptional events. Yet even as the image of the traumatized soldier evolved from sick and cowardly to sympathetic victim, PTSD increasingly became associated with violent behavior in the public imagination, and the stereotype of the "crazy vet" emerged as a result. In the present day, even news coverage drawing attention to veterans' suffering frequently makes its point by linking posttraumatic stress with violent crime, despite the paucity of data linking PTSD diagnosis with violence and criminality.[38,81]

Evolutions such as these not only imbued the mentally ill with an imagined potential for violence, but also encouraged psychiatrists and the general public to define violent acts as symptomatic of mental illness. As the following section suggests, the diagnostic evolution of schizophrenia additionally positioned psychiatric discourse as authoritative, not just on clinical "conditions" linking guns with mental illness, but on political, social, and racial ones as well.

## THE ASSUMPTION THAT WE SHOULD LOOK OUT FOR DANGEROUS LONERS

Mass shootings in the United States are often framed as the work of loners—unstable, angry White men who never should have had access to firearms. "Gunman a Loner Who Felt No Pain" read a headline in the wake of the Newtown shooting.[82,83] ABC News detailed how geneticists planned to study Lanza's DNA for individual-level "abnormalities or mutations,"[84] and the Associated Press later described how Newtown spurred research on the brains of mass shooters.[85] Meanwhile, CBS News reported that Isla Vista shooter Elliot Rodger was a "smart loner" who had trouble looking people in the eye.[86]

Lanza, Rodger, and other recent shooters undoubtedly led troubled solitary lives—lives marked by psychological symptoms, anomie, and despair.[87,88] It is important to note, however, that the seemingly self-evident images of the mentally disturbed, gun-obsessed, White male loner or the individually pathologized White male brain are also relatively recent phenomena. Critics hold that this framing plays off of rhetoric about hegemonic White male individualism and privilege that ultimately reinforce wider arguments for gun rights.[89–91]

In the 1960s and 1970s, by contrast, many of the men labeled as violent and mentally ill were also, it turned out, Black. And, when the potential assailants of a crime were Black, US psychiatric and popular culture frequently blamed "Black culture" or Black activist politics—not individual, disordered brains—for the threats such men were imagined to pose. Such associations were particularly prevalent in the decades surrounding the release of the *DSM-II*. For instance, writing in the *Archives of General Psychiatry*, Bromberg and Simon described a "protest psychosis" in which the rhetoric of the Black Power movement drove "Negro men" to insanity, leading to attacks on "Caucasians" and "antiwhite productions and attitudes."[92]

Raskin et al. wrote that Blacks with schizophrenia rated higher than Whites on a set of "hostility variables" because of delusional beliefs that "their civil rights were being compromised or violated."[93(p73)] Brody problematically argued that "growing up as a Negro in America may produce distortions or impairments in the capacity to participate in the surrounding culture which will facilitate the development of schizophrenic types of behavior."[94(p343)] And Vitols et al. linked the finding that "incidence of hallucinations was significantly higher among Negro schizophrenics than among white schizophrenics first admitted to the state hospital system" to the possibility that "there are factors in the Negro culture that predispose to more severe schizophrenic illness."[95(p475)]

Similar themes appeared in visual iconography. In 1 example, 1960s- and 1970s-era advertisements for the antipsychotic medication Haldol that appeared in the *Archives of General Psychiatry* showed the troubling, distorted image of an angry Black man in an urban scene (Figure 2). The man shakes a threatening, inverted Black Power fist. "Assaultive and belligerent?" the text asks. "Cooperation often begins with Haldol."[96(p732–733)]

A number of historical documents suggest that racialized and gendered overtones also shaped 1960s-era associations between schizophrenia and gun violence in the United States. For instance, a *Chicago Tribune* article in July 1966 advised readers to remain clear of an armed and dangerous "Negro mental patient" named Leroy Ambrosia Frazier, "an extremely dangerous and mentally unbalanced schizophrenic escapee from a mental institution, who has a lengthy criminal record and history of violent assaults."[76]

Meanwhile, FBI profilers spuriously diagnosed many "pro-gun" Black political leaders with militant forms of schizophrenia as a way of highlighting the insanity of their political activism. According to declassified documents,[14] the FBI diagnosed Malcolm X with "pre-psychotic paranoid schizophrenia," and with membership in the Communist Party and the "Muslim Cult of Islam," while highlighting his attempts to obtain firearms and his "plots" to overthrow the government. The FBI also diagnosed Robert Williams, the controversial head of the Monroe, North Carolina, chapter of the NAACP as schizophrenic, armed, and dangerous during

**Ex 1, p. 5**



**FIGURE 2—Haldol advertisement.**[96]

his flight from trumped-up kidnapping charges in the early 1960s. As an article in the *Amsterdam News* described it, "Williams allegedly has possession of a large quantity of firearms, including a .45 caliber pistol. . . . He has previously been diagnosed as schizophrenic and has advocated and threatened violence."[97]

Malcolm X, Robert Williams, and other leaders of Black political groups were far from schizophrenic. But fears about their political sentiments, guns, and sanity mobilized substantial response. Articles in the *American Journal of Psychiatry*, such as a 1968 piece titled "Who Should Have a Gun?" urged psychiatrists to address "the urgent social issue" of firearms in response to "the threat of civil disorder."[21] And Congress began serious debate about gun control legislation leading to the Gun Control Act of 1968.

Recent history thus suggests that cultural politics underlie anxieties about whether guns and mental illness are understood to represent individual or communal etiologies. In the 1960s and 1970s, widespread concerns about Black social and political violence fomented calls for widespread reforms in gun ownership. As this played out, politicians, FBI profilers, and psychiatric authors argued for the right to use mental health criteria to limit gun access, not just to severely mentally ill persons, but also to "drunkards," "drug users," and political protesters.[21(p841)] Building on these assumptions, the American Psychiatric Association later recommended that "strong controls be placed on the availability of all types of firearms to private citizens."[98(p630)]

However, in the present day, the actions of lone White male shooters lead to calls to expand gun rights, focus on individual brains, or limit gun rights just for the severely mentally ill. Indeed it would seem political suicide for a legislator or doctor[99] to hint at restricting the gun rights for White Americans, private citizens, or men, even though these groups are frequently linked to high-profile mass shootings. Meanwhile, members of political groups such as the Tea Party who advocate broadening gun rights to guard against government tyranny—indeed the same claims made by Black Panther leaders in the 1960s—take seats in the US Congress rather than being subjected to psychiatric surveillance.

## THE ASSUMPTION THAT GUN CONTROL WON'T PREVENT ANOTHER MASS SHOOTING

The mantra that gun control "would not have prevented Newtown" is frequently cited by opponents of such efforts. This contention generally assumes that, because none of the recent mass shooters in Tucson, Aurora, Newtown, or Isla

Ex 1, p. 6

Vista used weapons purchased through unregulated private sale or gun shows, gun control in itself would be ineffective at stopping gun crime, and that gun purchase restrictions or background checks are in any case rendered moot when shooters have mental illness.[100,101]

No one wants another tragedy like Newtown—on this point all sides of the gun debate agree. Moreover, it is widely acknowledged by persons on all sides of that debate that there is no guarantee that the types of restrictions voted down by the US Senate in April 2013, based largely on background checks, would prevent the next mass crime.[102,103] Indeed, a growing number of clinicians agree that, to cite Mayo Clinic psychiatrist J. Michael Bostwick, "taking guns away from the mentally ill won't eliminate mass shootings" unless such efforts are linked to larger prevention efforts that have a broader impact on communities.[104(p191)]

In other words, the "won't prevent another Newtown" framing presupposes that stopping the next mass shooting is the goal of gun control, and links the failure of such efforts to their inability to do so.[105] Yet, as discussed previously, many scholars who study violence prevention hold that mass shootings occur too infrequently to allow for statistical modeling, and as such serve as poor jumping-off points for effective public health interventions. Moreover, the focus on individual crimes or the psychologies of individual shooters obfuscates attention to community-level everyday violence and the widespread symptoms produced by living in an environment engulfed by fear of guns and shootings.

Here as well, tensions of race and social class have an impact on the framing of the "insanity" of gun violence as an individual or group problem. The United States sees an average of 32 000 handgun-related deaths per year, and firearms are involved in 68% of homicides, 52% of suicides, 43% of robberies, and 21% of aggravated assaults.[32] Far from the national glare, this everyday violence has a disproportionate impact on lower-income areas and communities of color,[106] and is widely held to be the cause of widespread anxiety disorders and traumatic stress symptoms.[107,108]

Given this terrain, it is increasingly the case that, when violence-prevention experts talk about ebbing gun crime linked to mental illness, they do not mean that mental health practitioners will avert the next random act of violence such as Newtown, though of course stopping mass crime remains a vital goal.[109] Instead, they focus on policies that have an impact on broader populations in areas such as Oakland, California—which averaged 11 gun crimes a day in 2013[110]—or Chicago, Illinois—which saw a 38% spike in gun crime in 2012 and another surge in July 2014.[111,112] Research in these locales tacitly recognizes that seeing a psychiatrist or other mental health professional is a class-based activity not available in many low-income neighborhoods, and that in any case the insanity of urban gun violence all too often reflects the larger madness of not investing more resources to support social and economic infrastructures. As an example of this approach, writing in the *Journal of Urban Health*, Calhoun describes how an organization in Oakland "trained young people living in California communities with the highest rates of gun violence to become peer educators and leaders to reduce both the supply of, and demand for, guns."[113(p72)]

## CONCLUSIONS

Our brief review suggests that connections between mental illness and gun violence are less causal and more complex than current US public opinion and legislative action allow. US gun rights advocates are fond of the phrase "guns don't kill people, people do." The findings cited earlier in this article suggest that neither guns nor people exist in isolation from social or historical influences. A growing body of data reveals that US gun crime happens when guns and people come together in particular, destructive ways. That is to say, gun violence in all its forms has a social context, and that context is not something that "mental illness" can describe nor that mental health practitioners can be expected to address in isolation.

To repeat, questioning the associations between guns and mental illness in no way detracts from the dire need to stem gun crime. Yet as the fractious US debate about gun rights plays out—to uncertain endpoint—it seems incumbent to find common ground beyond assumptions about whether particular assailants meet criteria for specific illnesses, or whether mental health experts can predict violence before it occurs. Of course, understanding a person's mental state is vital to understanding his or her actions. At the same time, our review suggests that focusing legislative policy and popular discourse so centrally on mental illness is rife with potential problems if, as seems increasingly the case, those policies are not embedded in larger societal strategies and structural-level interventions.

Current literature also suggests that agendas that hold mental health workers accountable for identifying dangerous assailants puts these workers in potentially untenable positions because the legal duties they are asked to perform misalign with the predictive value of their expertise. Mental health workers are in these instances asked to provide clinical diagnoses to social and economic problems.[114] In this sense, instead of accepting the expanded authority provided by current gun legislation, mental health workers and organizations might be better served by identifying and promoting areas of common cause between clinic and community, or between the social and psychological dimensions of gun violence.[115] Connections between loaded handguns and alcohol, the mental health effects of gun violence in low-income communities, or the relationships between gun violence and family, social, or socioeconomic networks are but a few of the topics in which mental health expertise might productively join community and legislative discourses to promote more effective medical and moral arguments for sensible gun policy than currently arise among the partisan rancor.

Put another way, perhaps psychiatric expertise might be put to better use by enhancing US discourse about the complex anxieties, social and economic formations, and blind assumptions that make people fear each other in the first place. Psychiatry could help society interrogate what guns mean to everyday people, and why people feel they need guns or reject guns out of hand. By addressing gun discord as symptomatic of deeper concerns, psychiatry could, ideally, promote more meaningful public conversations on the impact of guns on civic life. And it could join with public health researchers, community activists, law enforcement officers, or business leaders to identify and address the underlying structural[116] and infrastructural[117] issues that foster real or imagined notions of mortal fear.

Our review also suggests that the stigma linked to guns and mental illness is complex, multifaceted, and itself politicized, in as much as the decisions about which crimes US culture diagnoses

**Ex 1, p. 7**

| FRAMING HEALTH MATTERS |

as "crazy" and which it deems "sane" are driven as much by the politics and racial anxieties of particular cultural moments as by the workings of individual disturbed brains. Beneath seemingly straightforward questions of whether particular assailants meet criteria for particular mental illnesses lay ever-changing categories of race, gender, violence, and, indeed, of diagnosis itself.

Finally, forging opinion and legislation so centrally on the psychopathologies of individual assailants makes it harder for the United States to address how mass shootings reflect group psychologies in addition to individual ones.[16] Persons in the United States live in an era that has seen an unprecedented proliferation of gun rights and gun crimes, and the data we cite show that many gun victims are exposed to violence in ways that are accidental, incidental, relational, or environmental. Yet this expansion has gone hand in hand with a narrowing of the rhetoric through which US culture talks about the role of guns and shootings.[118] Insanity becomes the only politically sane place to discuss gun control. Meanwhile, a host of other narratives, such as displaced male anxiety about demographic change, the mass psychology of needing so many guns in the first place, or the symptoms created by being surrounded by them, remain unspoken.

Mass shootings represent national awakenings and moments when seeming political or social adversaries might come together to find common ground, whether guns are allowed, regulated, or banned. Doing so, however, means recognizing that gun crimes, mental illnesses, social networks, and gun access issues are complexly interrelated, and not reducible to simple cause and effect. Ultimately, the ways our society frames these connections reveal as much about our particular cultural politics, biases, and blind spots as it does about the acts of lone, and obviously troubled, individuals. ∎

## About the Authors

*Jonathan M. Metzl is with the Center for Medicine, Health, and Society and the Departments of Sociology and Psychiatry, Vanderbilt University, Nashville, TN. Kenneth T. MacLeish is with the Center for Medicine, Health, and Society and the Department of Anthropology, Vanderbilt University.*

*Correspondence should be sent to Jonathan M. Metzl, Director, Vanderbilt Center for Medicine, Health, and Society, 2301 Vanderbilt Place, Nashville, TN 37235 (e-mail: jonathan.metzl@vanderbilt.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted August 9, 2014.*

## Contributors

Both authors conceptualized and designed the analysis and wrote and edited the article.

## Acknowledgments

The authors wish to thank Hannah Florian, Nathan Pauley, Mark Wallace, and the Vanderbilt Brain Institute, and 4 outstanding anonymous reviewers for their assistance with developing this article.

## Human Participant Protection

This review article does not involve human participants. Our research adheres to the Principles of Ethical Practice of Public Health of the American Public Health Association.

## References

1. Turndorf J. Was Adam Lanza an undiagnosed schizophrenic? *Psychol Today.* December 20, 2012. Available at: http://www.psychologytoday.com/blog/we-can-work-it-out/201212/was-adam-lanza-undiagnosed-schizophrenic. Accessed July 23, 2014.

2. Steinberg P. Our failed approach to schizophrenia. *New York Times.* December 25, 2012: Opinion. Available at: http://www.nytimes.com/2012/12/26/opinion/our-failed-approach-to-schizophrenia.html?_r=0. Accessed July 23, 2014.

3. Coulter A. Guns don't kill people, the mentally ill do. 2013. Available at: http://www.anncoulter.com/columns/2013-01-16.html. Accessed July 23, 2014.

4. Kliff S. The NRA wants an "active" mental illness database. Thirty-eight states have that now. *Washington Post.* December 21, 2012. Available at: http://www.washingtonpost.com/blogs/wonkblog/wp/2012/12/21/the-nra-wants-an-active-mental-illness-database-thirty-eight-states-have-that-now. Accessed March 22, 2014.

5. Kaplan T, Hakim D. New York lawmakers reach deal on new gun curbs. *New York Times.* January 14, 2013: NY/Region. Available at: http://www.nytimes.com/2013/01/15/nyregion/new-york-legislators-hope-for-speedy-vote-on-gun-laws.html. Accessed July 23, 2014.

6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones.* November 9, 2012. Available at: http://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness. Accessed July 23, 2014.

7. Lankford A. Mass shooters in the United States, 1966–2010: differences between attackers who live and die. *Justice Q.* 2013; Epub ahead of print June 20, 2013.

8. Mental health and the Aurora shooting. *The Brian Lehrer Show.* July 31, 2012. Available at: http://www.wnyc.org/story/226661-mental-health-and-aurora-colorado-shooting/?utm_source=sharedUrl&utm_media=metatag&utm_campaign=sharedUrl. Accessed July 23, 2014.

9. Pickert K, Cloud J. If you think someone is mentally ill: Loughner's six warning signs. *Time.* January 11, 2011. Available at: http://content.time.com/time/nation/article/0, 8599, 2041733,00.html. Accessed July 23, 2014.

10. Solomon A. The reckoning: the father of the Sandy Hook killer searches for answers. *New Yorker.* March 17, 2014. Available at: http://www.newyorker.com/reporting/2014/03/17/140317fa_fact_solomon?currentPage=all. Accessed July 23, 2014.

11. Martin A. Asperger's is accused but still not guilty. *Huffington Post.* June 6, 2014. Available at: http://www.huffingtonpost.com/areva-martin/aspergers-is-accused-but-_b_5434413.html. Accessed July 20, 2014.

12. Luo M. NRA stymies firearms research, scientists say. *New York Times.* January 25, 2011. Available at: http://www.nytimes.com/2011/01/26/us/26guns.html. Accessed July 23, 2014.

13. Editorial Board. Legislating ignorance about guns. *New York Times.* June 16, 2014. Available at: http://www.nytimes.com/2014/06/17/opinion/legislating-ignorance-about-guns.html?emc=eta1&_r=0. Accessed July 23, 2014.

14. Metzl JM. *The Protest Psychosis: How Schizophrenia Became a Black Disease.* Boston, MA: Beacon Press; 2010.

15. MacLeish KT. *Making War at Fort Hood: Life and Uncertainty in a Military Community.* Princeton, NJ: Princeton University Press; 2013.

16. Metzl JM. Why are the mentally ill still bearing arms? *Lancet.* 2011;377(9784):2172–2173.

17. Metzl JM, MacLeish KT. Triggering the debate: faulty associations between violence and mental illness underlie U.S. gun control efforts. *Risk Regul.* 2013;25:8–10.

18. Johns Hopkins Center for Gun Policy and Research. Guns, public health and mental illness: an evidence-based approach for state policy. Consortium for Risk-Based Firearm Policy. 2013. Available at: http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/GPHMI-State.pdf. Accessed October 1, 2014.

19. O'Mara M. It's not about "stand your ground," it's about race. *CNN.* February 19, 2014. Available at: http://www.cnn.com/2014/02/19/opinion/omara-stand-your-ground-and-race/index.html. Accessed July 23, 2014.

20. Carroll AE. Do you own a gun? In Florida, doctors can't ask you that. *New York Times.* July 29, 2014. Available at: http://www.nytimes.com/2014/07/30/upshot/do-you-own-a-gun-in-florida-doctors-cant-ask-you-that.html. Accessed August 1, 2014.

21. Rotenberg LA, Sadoff RL. Who should have a gun? Some preliminary psychiatric thoughts. *Am J Psychiatry.* 1968;125(6):841–843.

22. Breggin P. *Reclaiming Our Children: A Healing Plan for a Nation in Crisis.* New York, NY: Basic Books; 2000.

23. Preview: imminent danger. *60 Minutes.* CBS. 2013. Available at: http://www.cbsnews.com/videos/preview-imminent-danger. Accessed July 23, 2014.

24. *District of Columbia v Heller*, 07–290 (DC Cir 2008).

25. Appelbaum PS. Violence and mental disorders: data and public policy. *Am J Psychiatry.* 2006;163(8):1319–1321.

26. Centers for Disease Control and Prevention. Leading causes of death reports. National and regional 1999–2010. February 19, 2013. Available at: http://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html. Accessed July 23, 2014.

27. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones.* May 24, 2014. Available at: http://www.motherjones.com/politics/2012/07/mass-shootings-map?page=2. Accessed July 20, 2014.

28. Mass shooting tracker. Available at: http://shootingtracker.com/wiki/Main_Page. Accessed July 20, 2014.

29. US Department of Justice. A study of active shooter incidents in the United States between 2000 and 2013.

**Ex 1, p. 8**

Available at: http://www.fbi.gov/news/stories/2014/september/fbi-releases-study-on-active-shooter-incidents/pdfs/a-study-of-active-shooter-incidents-in-the-u.s.-between-2000-and-2013. Accessed October 1, 2014.

30. Horwitz AV. *Creating Mental Illness*. Chicago, IL: University of Chicago Press; 2003.

31. Swanson JW. Explaining rare acts of violence: the limits of evidence from population research. *Psychiatr Serv.* 2011;62(11):1369–1371.

32. Firearm and Injury Center at Penn. Firearm injury in the U.S. 2009. Available at: http://www.uphs.upenn.edu/ficap/resourcebook/Final%20Resource%20Book%20Updated%202009%20Section%201.pdf. Accessed July 23, 2014.

33. Choe JY, Teplin LA, Abram KM. Perpetration of violence, violent victimization, and severe mental illness: balancing public health concerns. *Psychiatr Serv.* 2008;59(2):153–164.

34. McNiel DE, Weaver CM, Hall SE. Base rates of firearm possession by hospitalized psychiatric patients. *Psychiatr Serv.* 2007;58(4):551–553.

35. Large MM. Treatment of psychosis and risk assessment for violence. *Am J Psychiatry.* 2014;171(3):256–258.

36. Keers R, Ullrich S, DeStavola BL, Coid JW. Association of violence with emergence of persecutory delusions in untreated schizophrenia. *Am J Psychiatry.* 2014;171(3):332–339.

37. Swanson JW, Holzer CE, Ganju VK, Jono RT. Violence and psychiatric disorder in the community: evidence from the epidemiologic catchment area surveys. *Psychiatr Serv.* 1990;41(7):761–770.

38. Luo M, Mcintire M. When the right to bear arms includes the mentally ill. *New York Times.* December 21, 2013: US. Available at: http://www.nytimes.com/2013/12/22/us/when-the-right-to-bear-arms-includes-the-mentally-ill.html. Accessed July 23, 2014.

39. Grohol J. Violence and mental illness: simplifying complex data relationships. *Psych Central.* Available at: http://psychcentral.com/blog/archives/2007/05/02/violence-and-mental-illness-simplifying-complex-data-relationships. Accessed July 1, 2014.

40. Elbogen EB, Johnson SC. The intricate link between violence and mental disorder: results from the National Epidemiologic Survey on Alcohol and Related Conditions. *Arch Gen Psychiatry.* 2009;66(2):152–161.

41. Fazel S, Grann M. The population impact of severe mental illness on violent crime. *Am J Psychiatry.* 2006;163(8):1397–1403.

42. Friedman R. A misguided focus on mental illness in gun control debate. *New York Times.* December 17, 2012: Health. Available at: http://www.nytimes.com/2012/12/18/health/a-misguided-focus-on-mental-illness-in-gun-control-debate.html. Accessed July 23, 2014.

43. Nestor PG. Mental disorder and violence: personality dimensions and clinical features. *Am J Psychiatry.* 2002;159(12):1973–1978.

44. Brekke JS, Prindle C, Bae SW, Long JD. Risks for individuals with schizophrenia who are living in the community. *Psychiatr Serv.* 2001;52(10):1358–1366.

45. Deadly force. Police and the mentally ill. *Portland Press Herald.* Available at: http://www.pressherald.com/special/Maine_police_deadly_force_series_Day_1.html. Accessed March 23, 2014.

46. Steadman HJ, Mulvey EP, Monahan J, et al. Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. *Arch Gen Psychiatry.* 1998;55(5):393–401.

47. Soliman AE, Reza H. Risk factors and correlates of violence among acutely ill adult psychiatric inpatients. *Psychiatr Serv.* 2001;52(1):75–80.

48. Rapoport A. Guns—not the mentally ill—kill people. *Am Prospect.* February 7, 2013. Available at: http://prospect.org/article/guns%E2%80%94not-mentally-ill%E2%80%94kill-people. Accessed July 23, 2014.

49. Brammer J. Kentucky Senate approves bill allowing concealed guns in bars if owner doesn't drink. February 20, 2014. Available at: http://www.kentucky.com/2014/02/20/3100119/kentucky-senate-approves-bill.html. Accessed July 23, 2014.

50. Monahan J, Steadman H, Silver E, et al. *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence.* New York, NY: Oxford University Press; 2001.

51. Van Dorn R, Volavka J, Johnson N. Mental disorder and violence: is there a relationship beyond substance use? *Soc Psychiatry Psychiatr Epidemiol.* 2012;47(3):487–503.

52. Lott JR. *More Guns, Less Crime: Understanding Crime and Gun-Control Laws.* Chicago, IL: The University of Chicago Press; 2010.

53. Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US regions and states, 1988–1997. *Am J Public Health.* 2002;92(12):1988–1993.

54. Siegel M, Ross CD, King C. The relationship between gun ownership and firearm homicide rates in the United States, 1981–2010. *Am J Public Health.* 2013;103(11):2098–2105.

55. Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health.* 2014;9(2):293–302.

56. The Editorial Board. Craven statehouse behavior. *New York Times.* March 14, 2014. Available at: http://www.nytimes.com/2014/03/15/opinion/craven-statehouse-behavior.html. Accessed July 23, 2014.

57. Lewiecki EM, Miller SA. Suicide, guns, and public policy. *Am J Public Health.* 2013;103(1):27–31.

58. Centers for Disease Control and Prevention. FAST-STATS - Suicide and self-inflicted injury. December 30, 2013. Available at: http://www.cdc.gov/nchs/fastats/suicide.htm. Accessed July 23, 2014.

59. Chapman S, Alpers P, Agho K, Jones M. Australia's 1996 gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings. *Inj Prev.* 2006;12(6):365–372.

60. Papachristos AV, Braga AA, Hureau DM. Social networks and the risk of gunshot injury. *J Urban Health.* 2012;89(6):992–1003.

61. Hamilton B. Odds that you'll be killed by a stranger in NYC on the decline. *New York Post.* January 5, 2014. Available at: http://nypost.com/2014/01/05/odds-that-youll-be-killed-by-a-stranger-in-nyc-on-the-decline. Accessed July 23, 2014.

62. US Secret Service and US Department of Education. Final report and findings of the safe school initiative: implications for the prevention of school attacks in the United States. Available at: http://www2.ed.gov/admins/lead/safety/preventingattacksreport.pdf. Accessed July 20, 2014.

63. Richman J. A list of California gun bills signed or vetoed by Gov. Jerry Brown. October 11, 2013. Available at: http://www.mercurynews.com/nation-world/ci_24291222/list-california-gun-bills-signed-or-vetoed-by. Accessed July 23, 2014.

64. Sher A. Tennessee Senate OK's bill that requires mental health professionals to report threats. March 21, 2013. Available at: http://www.timesfreepress.com/news/2013/mar/21/tennessee-senate-oks-bill-requires-mental-health-p/?breakingnews. Accessed July 23, 2014.

65. Steadman H, Cocozza J. Psychiatry, dangerousness and the repetitively violent offender. *J Crim Law Criminol.* 1978;69(2):226–231.

66. Neuman F. Is it possible to predict violent behavior? *Psychol Today.* December 16, 2012. Available at: http://www.psychologytoday.com/blog/fighting-fear/201212/is-it-possible-predict-violent-behavior. Accessed July 23, 2014.

67. Grady D. Signs may be evident in hindsight, but predicting violent behavior is tough. *New York Times.* September 18, 2013: US. Available at: http://www.nytimes.com/2013/09/19/us/signs-may-be-evident-in-hindsight-but-predicting-violent-behavior-is-tough.html. Accessed July 23, 2014.

68. Dvoskin J. What are the odds on predicting violent behavior? *Vachss.* Available at: http://www.vachss.com/guest_dispatches/dvoskin2.html. Accessed March 23, 2014.

69. Brooks D. The politicized mind. *New York Times.* January 10, 2011: Opinion. Available at: http://www.nytimes.com/2011/01/11/opinion/11brooks.html. Accessed July 23, 2014.

70. Noyes AP. *Textbook of Psychiatry.* 1st ed. New York, NY: Macmillan; 1927.

71. Shyness is blamed in mental illness. *New York Times.* December 29, 1929: A9.

72. Psychiatrists are told of "literary artists" who evidence schizophrenia: grandiloquence is sign. *New York Times.* May 15, 1935: A23.

73. Cooley D. Don't tell them we're all going crazy. *Better Homes Gard.* 1947;(July):122–125.

74. Marsden A, Adams J. Are you likely to be a happily married woman. *Ladies Home J.* 1949March : 31.

75. Serpasil advertisement. *Am J Psychiatry.* 1955;112(5):xi.

76. FBI adds Negro mental patient to "10 most wanted" list. *Chicago Tribune.* July 6, 1966: A4.

77. The screen. *New York Times.* September 12, 1963: A32.

78. Raz M. *What's Wrong With the Poor?: Psychiatry, Race, and the War on Poverty.* Chapel Hill, NC: University of North Carolina Press; 2013.

79. *Diagnostic and Statistical Manual of Mental Disorders.* Washington, DC: American Psychiatric Association Press; 1952:26–27.

80. *Diagnostic and Statistical Manual of Mental Disorders.* 2nd ed. Washington, DC: American Psychiatric Association; 1968.

81. MacLeish KT. "Busting my ass, defending yours": everyday, the cost of war at Fort Hood. Available at: http://time.com/50178/fort-hood-shooting-life-inside. Accessed July 20, 2014.

82. Associated Press. School adviser: gunman a loner who felt no pain. *Fox Nation.* 2012. Available at: http://nation.foxnews.com/adam-lanza/2012/12/16/school-adviser-gunman-loner-who-felt-no-pain. Accessed July 23, 2014.

Ex 1, p. 9

83. Adam Lanza was a "loner" who felt little pain: teacher. *Huffington Post*. December 15, 2012. Available at: http://www.huffingtonpost.com/2012/12/15/adam-lanza-pain-loner-teacher_n_2308641.html. Accessed July 23, 2014.

84. Walshe S. DNA of Newtown shooter Adam Lanza to be studied by geneticists. *ABC News*. December 27, 2012. Available at: http://abcnews.go.com/US/dna-newtown-shooter-adam-lanza-studied-geneticists/story?id=18069343. Accessed July 23, 2014.

85. Associated Press. Newtown parents back study for clues to violence in brain. April 15, 2013. Available at: http://www.foxnews.com/health/2013/04/15/newtown-parents-back-study-for-clues-to-violence-in-brain. Accessed July 23, 2014.

86. Isla Vista suspect's childhood friend: "The guy I knew wouldn't say a word." *CBSLA*. May 26, 2014. Available at: http://losangeles.cbslocal.com/2014/05/26/isla-vista-shooters-childhood-friend-the-guy-i-knew-wouldnt-say-a-word. Accessed July 20, 2014.

87. Lankford A. *The Myth of Martyrdom: What Really Drives Suicide Bombers, Rampage Shooters, and Other Self-Destructive Killers*. New York, NY: Palgrave Macmillan; 2013.

88. Durkheim E. *Suicide*. New York, NY: Free Press, 1951; 246 [original work published in 1897].

89. Kennedy-Kollar D, Charles CAD. Hegemonic masculinity and mass murderers in the United States. *Southwest J Crim Justice*. 2013;8(2):62–74.

90. Abcarian R. #YesAllWomen speaks: Isla Vista rampage spurs talk of male privilege. *Los Angeles Times*. May 27, 2014. Available at: http://www.latimes.com/local/abcarian/la-me-ra-isla-vista-rampage-male-privilege-20140527-column.html. Accessed August 20, 2014.

91. Metzl JM. When shootings happen, gender has to be part of the conversation. *MSNBC*. Available at: http://on.msnbc.com/TmbHlK. Accessed July 20, 2014.

92. Bromberg W, Simon F. The "protest" psychosis: a special type of reactive psychosis. *Arch Gen Psychiatry*. 1968;19(2):155–160.

93. Raskin A, Crook TH, Herman KD. Psychiatric history and symptom differences in Black and White depressed patients. *J Consult Clin Psychol*. 1970;43(1):73–80.

94. Brody EB. Social conflict and schizophrenic behavior in young adult Negro males. *Psychiatry J Stud Interpersonal Processes*. 1961;24(4):337–346.

95. Vitols MM, Waters HG, Keeler MH. Hallucinations and delusions in White and Negro schizophrenics. *Am J Psychiatry*. 1963;120(5):472–476.

96. Haldol advertisement. *Arch Gen Psychiatry*. 1974;31(5):732–733.

97. FBI hunts NAACP leader. *New York Amsterdam News*. September 23, 1961: 1.

98. APA official actions. *Am J Psychiatry*. 1994;151(4):630.

99. Peters JW. Senate balks at Obama pick for Surgeon General. *New York Times*. March 14, 2014. Available at: http://www.nytimes.com/2014/03/15/us/senate-balks-at-obama-pick-for-surgeon-general.html. Accessed July 23, 2014.

100. Preventing Newtown: background checks won't. *New Hampshire Union Leader*. December 15, 2013. Available at: http://www.unionleader.com/apps/pbcs.dll/article?AID=/20131216/OPINION01/131219471. Accessed July 23, 2014.

101. Cooke CCW. Gun-control dishonesty. *National Review*. December 13, 2013. Available at: http://m.nationalreview.com/article/366226/gun-control-dishonesty-charles-c-w-cooke. Accessed July 23, 2014.

102. Healy G. New gun laws won't prevent another Sandy Hook. 2013. Available at: http://reason.com/archives/2013/04/16/new-gun-laws-wont-prevent-another-sandy. Accessed July 23, 2014.

103. Frumin A. 54–46: senators torpedo gun background checks. *MSNBC*. April 17, 2013. Available at: http://www.msnbc.com/hardball/54-46-senators-torpedo-gun-background-checks. Accessed July 23, 2014.

104. Bostwick JM. A good idea shot down: taking guns away from the mentally ill won't eliminate mass shootings. *Mayo Clin Proc*. 2013;88(11):1191–1195.

105. Dane L. Why more gun control won't prevent mass shootings. *The Daily Sheeple*. December 14, 2013. Available at: http://www.thedailysheeple.com/why-more-gun-control-wont-prevent-mass-shootings_122013. Accessed July 23, 2014.

106. Kaplan M, Kerby S. Top 10 reasons why communities of color should care about stricter gun-violence prevention laws. Available at: http://www.americanprogress.org/issues/race/news/2013/01/17/49885/top-10-reasons-why-communities-of-color-should-care-about-stricter-gun-violence-prevention-laws. Accessed March 25, 2014.

107. Ruiz R. Life, death, and PTSD in Oakland. *East Bay Express*. December 11, 2013. Available at: http://www.eastbayexpress.com/oakland/life-death-and-ptsd-in-oakland/Content?oid=3783767. Accessed July 23, 2014.

108. Harper High School. This American life. February 15, 2013. Available at: http://www.thisamericanlife.org/radio-archives/episode/487/harper-high-school-part-one; http://www.thisamericanlife.org/radio-archives/episode/488/harper-high-school-part-two. Accessed July 23, 2014.

109. Hall RC, Friedman S. Guns, schools, and mental illness: potential concerns for physicians and mental health professionals. *Mayo Clin Proc*. 2013;88(11):1272–1283.

110. Pickoff-White L. Oakland's gun problem: 11 firearm crimes a day. *KQED News Fix*. January 28, 2013. Available at: http://blogs.kqed.org/newsfix/2013/01/28/oaklands-gun-problem-11-firearm-crimes-a-day. Accessed July 23, 2014.

111. Davey M. Rate of killings rises 38 percent in Chicago in 2012. *New York Times*. June 25, 2012: US. Available at: http://www.nytimes.com/2012/06/26/us/rate-of-killings-rises-38-percent-in-chicago-in-12.html. Accessed July 23, 2014.

112. Ferrigno L. 47 shot. 5 dead. Chicago officials meet. *CNN*. July 22, 2014. Available at: http://www.cnn.com/2014/07/21/justice/chicago-deadly-weekend. Accessed July 23, 2014.

113. Calhoun D. Decreasing the supply of and demand for guns: Oakland's Youth Advocacy Project. *J Urban Health*. 2014;91(1):72–83.

114. Law Center to Prevent Gun Violence. Mental health reporting policy summary. 2013. Available at: http://smartgunlaws.org/mental-health-reporting-policy-summary. Accessed July 23, 2014.

115. Hiday VA. The social context of mental illness and violence. *J Health Soc Behav*. 1995;36(2):122–137.

116. Metzl JM, Hansen HH. Structural competency: theorizing a new medical engagement with stigma and inequality. *Soc Sci Med*. 2014;103:126–133.

117. Lavinghouze SR, Snyder K, Rieker PP. The component model of infrastructure: a practical approach to understanding public health program infrastructure. *Am J Public Health*. 2014;104(8):e14–e24.

118. Cohan M. Shooting blanks: the problem of how we talk about mass shootings. July 24, 2014. Available at: http://gendersociety.wordpress.com/2014/07/24/shooting-blanks. Accessed July 25, 2014.

**Ex 1, p. 10**